**BONDS ELLIS EPPICH SCHAFER JONES LLP**
Joshua N. Eppich (TX 24050567)
Ken Green (TX 24036677)
Eric T. Haitz (TX 24101851)
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: ken.green@bondsellis.com
Email: eric.haitz@bondsellis.com

*Counsel for the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 25-90010** |
| **GROFF TRACTOR MID ATLANTIC,** | § | |
| **LLC,** *et al.* | § | **(Jointly Administered)** |
| | § | |
| **Debtors.**[1] | § | |
| | § | |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT LIENS AND SUPER-PRIORITY CLAIMS, AND (C) GRANT ADEQUATE PROTECTION, (II) MODIFYING THE AUTOMATIC STAY, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN MONDAY, DECEMBER 15, 2025 AT 1:30 P.M.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors' federal tax identification numbers, are: Groff Tractor Mid Atlantic, LLC (7629), Dealer 2023 LLC (3275), and Groff Tractor Holdings, LLC (0486), and the location of the service address for the Debtors is: 1460 Main Street, Suite 200, Southlake, TX 76092.

**PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON DECEMBER 15, 2025, AT 1:30 PM IN ROOM 204, U.S. COURTHOUSE, 501 W. TENTH STREET, FORT WORTH, TEXAS 76102. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1.650.479.3207, MEETING ID: 2309 445 3213. VIDEO COMMUNICATION WILL BE BY USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE MORRIS'S HOME PAGE. THE MEETING CODE IS 2309-445-3213. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE MORRIS'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Groff Tractor Mid Atlantic, LLC ("GTMA"), Dealer 2023 LLC ("Dealer") and Groff Tractor Holdings, LLC ("Holdings," and collectively with GTMA and Dealer, the "Debtors") hereby move the Court for approval of post-petition financing (this "Motion") and represent as follows:

<strong>PRELIMINARY STATEMENT[2]</strong>

1. The Debtors seek approval of a post-petition financing facility consisting of (i) new money advances of up to $2.7 million from M&T, including up to $1.3 million on an interim basis, and (ii) a carve-out of sale proceeds from M&T, CNH Capital and other floor plan lenders from a going-concern sale, subject to a definitive agreement with the floor plan lenders.. This DIP financing is critical to the Debtors' efforts to run a value-maximizing sale process and consummate a going-concern sale of the Debtors' assets, which will preserve the jobs of the Debtors' employees

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in the Motion.

and maximize the value of the Debtors' assets for the benefit of all stakeholders. Further, the proposed DIP financing is the result of many weeks of negotiations among various stakeholders and will allow the Debtors to fund their operational and administrative expenses and continue their on-going operations while the Debtors seek to implement a sale of substantially all of their assets. Without the proposed DIP financing, the Debtors would be unable to pay their employees, unable to maintain critical business relationships with their customers, vendors, and suppliers, and would be forced to abruptly cease operations. The result would be an immediate loss of jobs, loss of revenue from operations and impairment of value of the Debtors' assets.

2. The Debtors seek entry of an interim order in the form attached as **<u>Exhibit 1</u>** (the "<u>Interim Order</u>") and entry of a final order, as applicable:

 a. authorizing the Debtors to enter into (a) the *Ratification and Amendment Agreement* (the "<u>DIP Credit Agreement</u>"), as may be amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth therein, dated of even date herewith, by and among by and among Manufacturers and Traders Trust Company ("<u>M&T</u>" or the "<u>Administrative Agent</u>") and the other Secured Parties (collectively with M&T, the "<u>DIP Lender</u>") and the Debtors, substantially in the form annexed to the Proposed Order as **<u>Exhibit A</u>**, and (b) the Loan Documents (as defined in the DIP Credit Agreement and, together with the DIP Credit Agreement, referred to herein as the "<u>DIP Loan Documents</u>");

 b. authorizing the Debtors to obtain, on a joint and several basis, post-petition loans, advances, and other financial accommodations in accordance with the terms and conditions set forth in the DIP Credit Agreement, by and among the Debtors and the DIP Lender, and the other Loan Documents (as defined in the DIP Credit Agreement and referred herein as the DIP Loan Documents, and in accordance with the Interim Order, secured by perfected senior priority security interests in and liens on the Collateral (as defined below) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (subject and subordinate only to the Carve-Out and the Permitted Liens (each as defined below));

 c. authorizing the Debtors to remit all collections, asset proceeds and payments, including, without limitation, all collections received since the Petition Date, (i) first to the Administrative Agent and the other Secured Parties, as lender to the Prepetition Credit Agreement (as defined below) (the "<u>Prepetition Lender</u>"), for application, or deemed application to all Prepetition Obligations (as defined below) until such obligations are fully repaid in accordance with the Prepetition

Credit Agreement (as defined below) and other Prepetition Loan Documents (as defined below), and (ii) then to the DIP Lender for application and repayment of all Obligations in accordance with the DIP Credit Agreement and the other DIP Loan Documents;

d.   as set forth below, approving certain stipulations by the Debtors as set forth in the Interim Order in connection with the Prepetition Credit Agreement and the Prepetition Loan Documents;

e.   as set forth below, authorizing the Debtors to provide adequate protection to the Prepetition Lender;

f.   authorizing the Debtors, with Prepetition Lender and DIP Lender consent, to use the Cash Collateral (as defined below) solely in accordance with the Interim Order and the DIP Budget (as hereinafter defined);

g.   waiving the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to sections 506(c) and 552(b) of the Bankruptcy Code;

h.   modifying the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and provisions of the Interim Order to the extent hereinafter set forth; and

i.   scheduling a final hearing on the Motion ("Final Hearing") to consider entry of a final order (the "Final Order") authorizing, among other things, the borrowing under the DIP Loan Documents on a final basis, as set forth herein and in the DIP Credit Agreement.

3.   The DIP Credit Agreement is the result of lengthy arms-length negotiations, involving both principals and advisors, and allows the Debtors to achieve their strategic goals in connection with these Chapter 11 Cases.

4.   The DIP Credit Agreement is the only actionable source of post-petition financing (the "DIP Facility") currently available to the Debtors to fund their ongoing operations and administrative expenses and thus represents the best source of post-petition financing. As described herein, the DIP Credit Agreement contains terms that are reasonable under the circumstances and provides the Debtors with the urgent liquidity needed to avoid immediate and irreparable harm, maintain business relationships with their vendors, suppliers and

customers, to pay their employees, and to otherwise fund their operations and these Chapter 11 Cases.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtor confirms its consent pursuant to Bankruptcy Rule 7008 to the entry of a final order by the Court in connection with the Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 364, 507, 541, 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## BACKGROUND

### A.      *General Background*

8.      On October 14, 2025 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their financial affairs as debtors in possession.

9.      On November 5, 2025, the United States Trustee appointed an official unsecured creditors committee (the "Committee"). No request for a trustee or examiner has been made in these Chapter 11 Cases.

10.     Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the *Declaration of Mike Juniper in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 43] (the "First Day Declaration").

**B.      The Prepetition Credit Agreement**

11.     On February 1, 2023, the Debtors and Groff Resources Holdings, LLC, a Texas limited liability company ("Resources") as a Guarantor entered into secured financing arrangements with M&T as administrative agent for the financial institutions from time to time party thereto as lenders, pursuant to which Prepetition Lender agreed to make revolving loans and advances available to Borrower in the amount of up to $77,000,000 as set forth in the Amended and Restated Credit Agreement, dated as of February 1, 2023, among Debtors and Resources, Administrative Agent and Lenders, as amended by the Limited Waiver and First Amendment to Amended and Restated Credit Agreement, dated as of July 20, 2023, the Forbearance Agreement and Second Amendment to Credit Agreement, dated as of December 21, 2023 (the "M&T Forbearance Agreement"), as further amended by Amendment No. 1 to Forbearance Agreement and Third Amendment to Credit Agreement, March 22, 2024, Amendment No. 2 to Forbearance Agreement and Fourth Amendment to Credit Agreement, dated as of June 28, 2024, Amendment No. 3 to Forbearance Agreement and Fifth Amendment to Credit Agreement, dated as of October 24, 2024, Amendment No. 4 to Forbearance Agreement and Sixth Amendment to Credit Agreement, dated as of February 21, 2025, Amendment No. 5 to Forbearance Agreement and Seventh Amendment to Credit Agreement, dated March 14, 2025, Amendment No. 6 to Forbearance Agreement and Eighth Amendment to Credit Agreement, dated May 6, 2025, and Amendment No. 7 to Forbearance Agreement and Ninth Amendment to Credit Agreement, dated

June 24, 2025 (together with the Forbearance Agreement as in effect immediately prior to the Petition Date, the "<u>Prepetition Credit Agreement</u>").

12.     In connection with the credit facility under the Prepetition Credit Agreement, (a) GTMA, Dealer 2023, and Resources (GTMA, Dealer 2023 and Resources, each individually a "<u>Guarantor</u>" and collectively, "<u>Guarantors</u>") absolutely and unconditionally guaranteed the payment in full of the Obligations (as defined in the Prepetition Credit Agreement) of Holdings (the "<u>Borrower</u>") and of the guaranteed Obligations of each other Guarantor (other than itself) pursuant to the terms of the continuing guarantee set forth in the Prepetition Credit Agreement and (b) the Borrower and Guarantors granted a security interest in and to substantially all of their assets and properties to secure the Obligations, including the guaranteed Obligations, as set forth in the Amended and Restated Pledge and Security Agreement, dated as of February 1, 2023, by the Borrower and Guarantors in favor of the Administrative Agent, the Prepetition Lender and the other Secured Parties (as defined in the Prepetition Credit Agreement) (as in effect immediately prior to the Petition Date, the "<u>Prepetition Security Agreement</u>") and together with all other agreements, guaranties, documents, notes, instruments and Uniform Commercial Code filings executed and/or delivered to or for the benefit of Administrative Agent and the other Secured Parties in connection with or related to the Prepetition Credit Agreement (together with the Prepetition Credit Agreement and the Prepetition Security Agreement, all as in effect immediately prior to the Petition Date, collectively, the "<u>Prepetition Loan Documents</u>").

13.     Pursuant to the Prepetition Credit Agreement and the other Prepetition Loan Documents, Administrative Agent and the other Secured Parties made advances and provided other credit and financial accommodations to the Borrower and Guarantors secured by substantially all of the assets of the Borrower and the Guarantors.

14.     The Borrower and Guarantors were justly and lawfully indebted and liable to the Prepetition Lender under the Prepetition Credit Agreement and the other Prepetition Loan Documents in the aggregate principal amount of not less than $75.4 million in respect of the Loan Obligations (as defined in the Prepetition Credit Agreement), which amount consists of (a) Revolving Loans (as defined in the Prepetition Credit Agreement) and (b) Cash Management Obligations (as defined in the Prepetition Credit Agreement), including all obligations, liabilities and indebtedness of Borrower and Guarantors arising under or related to the Purchase Card Program (as hereinafter defined), plus interest, fees, and costs (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Loan Documents), costs, charges, indemnities, and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Loan Documents (collectively, the "Prepetition Obligations"), all of which Prepetition Obligations are unconditionally owing by Borrower and Guarantors to Prepetition Lender, without offset, defense or counterclaim of any kind, nature or description whatsoever.

15.     As of the Petition Date, pursuant to and in connection with the Prepetition Loan Documents, the Borrower and Guarantors granted to the Administrative Agent, for the benefit of itself and the other Secured Parties, a security interest in and continuing lien on (the "Prepetition Liens") substantially all of their assets and property, (a) a valid, binding, properly perfected, enforceable, first priority security interest in and continuing lien on the collateral (which, for the avoidance of doubt, includes cash collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral"), which Prepetition Liens are not subject to avoidance,

recharacterization, subordination (whether equitable, contractual, or otherwise), recovery, attack, disgorgement, effect, rejection, reduction, disallowance, impairment, counterclaim, offset, crossclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law, subject and subordinate only, to the extent applicable, the Prepetition Floorplan Liens pursuant to the Floorplan Intercreditor Agreements and certain other liens permitted by the Prepetition Loan Documents, solely to the extent any such permitted liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date (the "<u>Prepetition Permitted Senior Liens</u>"). Included, without limitation, within the definition of Prepetition Permitted Senior Liens are the liens granted in favor of the following Floorplan Lenders (as hereinafter defined) in each case solely to the extent any such liens were valid, binding, enforceable, properly perfected, non-avoidable and senior in priority to the Prepetition Liens of Administrative Agent as of the Petition Date and subject to the Floorplan Intercreditor Agreements (as hereinafter defined) by and between each Floorplan Lender and Administrative Agent.

16. Pursuant to the Prepetition Credit Agreement, the Borrower and Guarantors agreed to maintain depository accounts at M&T into which all proceeds of accounts receivable and other sales and income from customers and clients of Borrower and Guarantors (the "<u>Customer Proceeds</u>") were agreed to be deposited to, and from which materially all disbursements were agreed to be made (the "<u>M&T Accounts</u>").

## C. *Prepetition Floorplan Financing*

17. Prior to the Petition Date, Borrower and Guarantors entered into certain floorplan financing arrangements with certain floorplan lenders including CNH Industrial Capital America, LLC ("<u>CNH Capital</u>"), U.S. Bank National Association, Deutsche Leasing USA, Inc., VFS US LLC/VFS Leasing Co., BOKF, NA DBA Bank of Texas, De Lage Landen Financial Services, Inc. and BMO Harris Bank N.A./Bank of the West (each individually a "<u>Floorplan Lender</u>" and

collectively, the "<u>Floorplan Lenders</u>") pursuant to which the Floorplan Lenders provided financing or credit terms to Borrower and Guarantors (each individually, a "<u>Floorplan Financing Facility</u>" and collectively, the "<u>Floorplan Financing Facilities</u>") to finance the purchase by Borrower and/or Guarantors of Inventory and Equipment to be held by Borrower and Guarantors for the sale or lease to customers secured by a lien on such Inventory and Equipment in favor of such Floorplan Lender  (the "<u>Prepetition Floorplan Liens</u>").  Prepetition Lender permitted the Borrower and Guarantors to enter into or continue to exist, certain of the Floorplan Financing Facilities with the Floorplan Lenders pursuant to the Prepetition Credit Agreement and to grant a lien in favor of certain Floorplan Lenders on such Prepetition Floorplan Collateral, subject to the terms and conditions of an intercreditor, a subordination agreement, and/or applicable law, as applicable (the "<u>Floorplan Intercreditor Agreements</u>").

18.    Funds deposited into the M&T Accounts, together with all Proceeds and products of the Prepetition Collateral and the Postpetition Collateral (as hereinafter defined), constitute "<u>Cash Collateral</u>" within the meaning of the Bankruptcy Code Section 363(a), other than funds which are Customer Proceeds from the sale or lease of Inventory or Equipment which at the time of sale are subject to a Floorplan Financing Facility of a Floorplan Lender in accordance with the Floorplan Intercreditor Agreements and the Interim Order.

### D.    *The Debtors' Need for Debtor in Possession Financing and Use of Cash Collateral*

19.    The Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate their businesses in the ordinary course of business and fund these Chapter 11 Cases without access to the financing provided under the DIP Credit Agreement.

20.    The Debtors require immediate access to the DIP Facility to ensure they have sufficient liquidity to satisfy their working capital and business operating needs, and the administrative costs of these Chapter 11 Cases.  Without immediate approval of the DIP Loan

Documents, the Debtors will lack funding that is essential to these Chapter 11 Cases which would cause immediate and irreparable harm to the value of the Debtors' estate to the detriment of all stakeholders. The DIP Facility solves the Debtors' near-term liquidity constraints by providing the Debtors with access to necessary capital.

**E.    *Alternative Sources of Financing Are Not Available on Better Terms***

21.    The Debtors believe that the DIP Loan Documents represent the best terms available to the Debtors for financing. Given their current financial condition, financing arrangements, and capital structure, and the circumstances of these Chapter 11 Cases, the Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, junior liens on encumbered property of the Estates, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by the DIP Lender pursuant to the DIP Loan Documents. The DIP Facility is critical to the Debtors' ability to pay the administrative costs of these Chapter 11 Cases and should provide the Debtors with sufficient liquidity to operate their businesses without creating a priming or valuation dispute at the outset of these Chapter 11 Cases.

22.    For all the reasons set forth herein, the DIP Facility is in the best interests of the Debtors' estates, and the Debtors respectfully request that the Court approve the DIP Facility on the terms and conditions described herein.

## CONCISE STATEMENT OF MATERIAL TERMS
## PURSUANT TO BANKRUPTCY RULE 4001

23.     The following chart contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the DIP Term Sheet and Interim

Order as applicable, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B):

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| **Parties to the DIP Loan Documents** Bankruptcy Rule 4001(c)(1)(B) | Interim Order para. 1. | Borrowers/Debtors:  Holdings, GTMA, and Dealer<br><br>Post-Petition Lender:     M&T and Floorplan Lenders |
| **Term** Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B) | Interim Order para. 3.3. | The DIP Facility shall expire upon the earlier of (a) expiration of Debtors' authority to borrow and obtain other financial accommodations from DIP Lender pursuant to the terms of the Interim Order and the DIP Loan Documents (except if such authority shall be extended with the prior written consent of DIP Lender, which consent shall not be implied or construed from any action, inaction or acquiescence by DIP Lender), and (b) the delivery by the DIP Lender of an Enforcement Notice upon the occurrence of an Event of Default declaring that the Obligations shall immediately become due and payable, in either case DIP Lender shall have no obligation whatsoever to make or extend any loans, advances, provide any financial or credit accommodations to Debtors or permit the use of Cash Collateral. |
| **Principal Amount of Loan** Bankruptcy Rule 4001(c)(1)(B) | Interim Order paras. 1.2 and 2.3. | Supplemental DIP Line Advances of $1.3 million provided, however, that if the Court shall have entered a Sale Order, in form and substance acceptable to Administrative Agent, approving the sale of all or substantially all the assets of the GTMA Business, advances shall be increased to $2.7 million and other revolving advances up to the principal amount of $12,851,000 including, without limitation, the amount advanced since the Petition Date. |
| **Loan Commitment** Bankruptcy Rule 4001(c)(1)(B) | Interim Order paras 1.2 and 2.3. | Supplemental DIP Line Advances of $1.3 million provided, however, that if the Court shall have entered a Sale Order, in form and substance acceptable to Administrative Agent, approving the sale of all or substantially all the assets of the GTMA Business, advances shall be increased to $2.7 million and other revolving advances up to the principal amount of $12,851,000 including, without limitation, the amount advanced since the Petition Date. |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | Interim Order paras. 2.3, 2.5, and 4.5. | <u>Reimbursement of Post-Petition Expenses</u>: The DIP Lender shall be entitled to reimbursement of its reasonable out-of-pocket expenses, including attorneys' and professionals' fees, incurred in connection with the DIP Facility and as provided for in the DIP Loan Documents. <br><br> <u>Releases</u>: Debtors shall provide Prepetition Lender a release of all claims arising out of or related to the Prepetition Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Borrower and Guarantors or Resources at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order. <br><br> Debtors will comply with the DIP Budget, attached to the Interim Order as **<u>Exhibit C</u>** (the "<u>Budget</u>"), subject to permitted variances as provided for in the DIP Credit Agreement. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | Ratification and Amendment Agreement (Exhibit A to Interim Order), para. 7.3. | Base rate plus 7%. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | Interim Order para D. | The Debtors shall be permitted to use Cash Collateral, proceeds of DIP Facility and proceeds of the Collateral only for the purposes and in the amounts set forth in the Budget, subject to permitted variances as provided for in the DIP Credit Agreement. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | Interim Order para. 2.5. | DIP Lender and Floorplan Lenders |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | Interim Order para. 5.1. | Each Debtor shall pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Credit Agreement, including, without limitation, the non-refundable payment to the (i) Prepetition Lender of the documented fees and expenses set forth in the Prepetition Loan Documents, including, without limitation, all fees, costs, disbursements and expenses of Otterbourg P.C., as legal counsel, Munsch Hardt Kopf & Harr, P.C., as local counsel, and BRG, as financial advisor, and (ii) DIP Lender of the documented fees and expenses set forth in the DIP Loan Documents including, without limitation the fees, costs, disbursements and expenses of Otterbourg P.C., as legal counsel, Munsch Hardt Kopf & Harr, P.C., as local counsel, and BRG, as financial advisor, in each case whether incurred before or after the Petition Date; provided, that Debtors shall pay all such documented fees and expenses within ten (10) business days of delivery of a statement or invoice for such documented fees and expenses (it being understood that such statements or invoices shall not be required to be maintained in accordance with the U.S. Trustee Guidelines, nor shall any such counsel or other professional be required to file any interim or final fee applications with the Court or otherwise seek Court's approval of any such payments) to the Debtors, the U.S. Trustee and the Official Committee of Unsecured Creditors (the "Committee") of GTMA and its debtor affiliates, unless, within such ten (10) business day period, the Debtors, the U.S. Trustee, or the Committee serves a written objection upon the requesting party detailing the specific fees or expenses to which such party objects along with an explanation for the basis of such objection, in which case, the Debtors shall immediately pay only such amounts that are not the subject of any objection and only pay the balance of such statements or invoices at such time and in such amount as subsequently agreed to by the requesting party and any objecting party or as otherwise ordered by the Court to be paid. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | Interim Order paras. 2.5. | The Debtors shall only be permitted to use the DIP Facility and Cash Collateral of the DIP Lender for the purposes and in the amounts set forth in the Budget subject to permitted variances as provided for in the DIP Credit Agreement. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | Interim Order para 2.5. | Debtors shall promptly provide the DIP Lender with all required financial reporting and other periodic reporting that is required to be provided to the DIP Lender under the DIP Loan Documents. Debtors shall furnish to Administrative Agent and the Floorplan Lenders each week, a written report, in form and substance acceptable to Administrative Agent, setting forth the amount of sales or leases of Equipment and Inventory and the amount of Proceeds collected by |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | Borrower and Guarantors for each Floorplan Lender under such Floorplan Lender's Floorplan Facility (the "Floorplan Lender Payment Report"); provided that the Floorplan Lender Payment Report delivered to each of the Floorplan Lenders shall be limited to sale information related to such Floorplan Lender's collateral and include copies of any bills of sale or retail installment sales agreements. |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | | |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | Interim Order paras. 2.1 and 2.5. | The Debtors' indebtedness under the DIP Facility and all other DIP Obligations (as defined in the DIP Loan Documents) will be secured by security interests and liens granted pursuant to section 364(c)(1), (c)(2), and (c)(3), as applicable, of the Bankruptcy Code (the "DIP Liens"). For all DIP Obligations (including, without limitation, subject to Section 4.1 of the Interim Order, the Prepetition Obligations rolled into the DIP Obligations in accordance with the terms hereof) now existing or hereafter arising pursuant to the Interim Order, the DIP Loan Documents or otherwise, DIP Lender is granted an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors (other than the Carve-Out), whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (other than the Carve- Out), which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; provided that, Administrative Agent's and the other Secured Parties' Super-Priority Claims with respect to Avoidance Proceeds shall be subject to first, reasonable marshalling by the Administrative Agent against other sources of recovery, and second, to Avoidance Proceeds (the "DIP Loan Superpriority Claim"). As security for any Diminution in Value, the Prepetition Lender shall be granted additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on all Collateral (the "Prepetition Lender Adequate Protection Liens"), which Prepetition Lender Adequate Protection Liens shall be junior and subordinate only to (A) the Carve-Out, (B) the Prepetition Permitted Senior Liens, and (C) DIP Lender's |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | liens on the Collateral to secure the Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.<br><br>As security for any Diminution in Value, Floorplan Lenders shall be granted additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on their respective Floorplan Lender Prepetition Collateral (the "<u>Floorplan Lender Adequate Protection Lien</u>" and, collectively with the Prepetition Lender Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), which Floorplan Lender Adequate Protection Lien shall be junior and subordinate only to (A) the Carve-Out, (B) DIP Lender's liens on the Collateral to secure the Obligations, and (C) solely with respect to the Collateral, the Prepetition Lender Adequate Protection Liens, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Floorplan Lender Prepetition Collateral. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | Interim Order para. 2.3. | "Carve Out" shall mean the sum of:<br><br>(i)     all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C § 1930(a);<br><br>(ii)    all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the fees and expenses set forth in Sections 2.3(a)(i) and (ii) of the Interim Order are defined as the "<u>Carve-Out Expenses</u>")<br><br>(iii)   subject to the terms and conditions of the Interim Order, Allowed Professional Fees (as defined below) incurred during the period commencing on the Petition Date and ending on the Trigger Date (as defined below) (the "<u>Pre-Trigger Date Period</u>") by attorneys, accountants and other professionals retained by the Debtors and the Committee under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "<u>Professionals</u>"), provided that the aggregate amount of such Allowed Professional Fees included in the Carve-Out pursuant to this clause (iii) shall not exceed the line item amounts for the "Debtors Professional Reserve" and the "UCC Professionals Reserve" as set forth in the Budget covering the Pre-Trigger Date Period, <u>less</u> the sum of all Allowed Professional Fees incurred during the Pre-Trigger Date Period and paid at any time and less the amount of any retainers either held by and/ or applied since the Petition Date (the "<u>Pre-Trigger Date Professional Fee Carve-Out</u>"); and<br><br>(iv)    subject to the terms and conditions contained in the Interim |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | Order, Allowed Professional Fees incurred by Professionals incurred beginning on the first business day after the Trigger Date in an aggregate amount not to exceed $100,000 (the "Post-Trigger Date Professional Fee Carve-Out"; and together with the Pre-Trigger Date Professional Fee Carve-Out, collectively, the "Professional Fee Carve-Out"). For the avoidance of doubt and notwithstanding anything to the contrary in the Interim Order or the DIP Loan Documents: (x) the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, the Adequate Protection Liens, the DIP Loan Superpriority Claim, the Prepetition Lender Superpriority Claim, the Floorplan Lender Superpriority Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations; and (y) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein, and nothing herein shall be construed to limit the ability of Professionals from obtaining payment of allowed fees and expenses from property of the Estates.

The term "Allowed Professional Fees" shall mean the unpaid and outstanding fees and expenses of Professionals (i) actually incurred on or after the Petition Date, and (ii) allowed and payable at any time by any order of the Court pursuant to sections 326, 328, 330 or 331 of the Bankruptcy Code (but excluding any transaction, restructuring, completion, success or similar fees); and (b) the term "Trigger Date" shall mean the date upon which DIP Lender provides written notice to the Debtors, the Committee, and the U.S. Trustee following the occurrence and during the continuation of an Event of Default, acceleration of the DIP Obligations, and election to fund the Post-Trigger Date Professional Fee Carve-Out. In the event that the Trigger Date occurs prior to the end of any week set forth in the Budget, then for purposes of calculating the portion of the Pre-Trigger Date Professional Fee Carve-Out available for such week, the amount of the "professional fee" line item in the DIP Budget for such week shall be multiplied by a fraction, the numerator of which shall be the number of days in such week prior to the Trigger Date, and the denominator of which shall be 7.

Notwithstanding anything to the contrary in the Interim Order, neither the Carve-Out nor the proceeds of Collateral or any DIP Loans, Letters of Credit or any other credit or financial accommodations provided under or in connection with the DIP Loan Documents shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any party, including any Debtor, any Committee, or any Professional in connection with any of the following: |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | (i) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (A) challenging the legality, validity, priority, perfection, or enforceability of (1) the Prepetition Obligations or Prepetition Lenders' liens on and security interests in the Prepetition Collateral or (2) the Obligations or DIP Lender's liens on and security interests in the Collateral; (B) invalidating, setting aside, avoiding or subordinating, in whole or in part, (1) the Prepetition Obligations or Prepetition Lenders' liens on and security interests in the Prepetition Collateral or (2) the Obligations or DIP Lender's liens on and security interests in the Collateral; or (3) preventing, hindering or delaying DIP Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the DIP Credit Agreement, the DIP Loan Documents, and the Interim Order; |
| | | (ii) a request to use Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code), without the prior written consent of DIP Lender in accordance with the terms and conditions of the Interim Order; |
| | | (iii) a request, without the prior written consent of the DIP Lender, for authorization to obtain debtor in possession financing or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code that does not provide for the Payment in Full of all the Prepetition Obligations and the Obligations on terms and conditions acceptable to the DIP Lender (other than as specifically provided herein) on the date any such financing or financial accommodation is approved by this Court; |
| | | (iv) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against DIP Lender or any of its respective officers, directors, employees, agents, attorneys, affiliates, predecessors, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from DIP Lender under chapter 5 of the Bankruptcy Code; |
| | | (v) the cost of investigation into any claims against Prepetition Lender arising under or in connection with the Prepetition |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | Loan Documents in excess of $25,000; |
| | | (vi) seeking relief under the Bankruptcy Code, including, without limitation, in each case under Section 105 of the Bankruptcy Code, to the extent such relief would restrict or impair the rights and remedies of any secured party as set forth in the Interim Order, the DIP Loan Documents, or the Final Order; or |
| | | (vii) any act which has or could directly, materially and adversely modify or compromise the rights and remedies of DIP Lender under this Interim Order, or which directly results in the occurrence of an Event of Default under any DIP Loan Documents, or the Interim Order. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Interim Order para. 2.5 | As security for any Diminution in Value, the Prepetition Lender shall be granted Prepetition Lender Adequate Protection Liens which Prepetition Lender Adequate Protection Liens shall be junior and subordinate only to (A) the Carve-Out, (B) the Prepetition Permitted Senior Liens, and (C) DIP Lender's liens on the Collateral to secure the Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral. As adequate protection for any Diminution in Value, as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of any Diminution in Value, Prepetition Lender shall be granted an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor bankruptcy cases (the "Prepetition Lender Superpriority Claim"). The Prepetition Lender Superpriority Claim shall be junior only to (A) the Carve-Out and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims, including administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever. The Debtors are authorized to pay, without further Court order, documented legal fees and expenses, whether incurred before or after the Petition Date, of counsel to the Prepetition Lender (in its capacity under the Prepetition Loan Documents), *provided,* that (a) the Debtors, the U.S. Trustee, and the Committee shall have ten (10) days from receipt of invoices to review the summary legal invoices of such counsel, and (b) in the event the Debtors, the U.S. Trustee, or Committee files with this Court an objection to any such legal invoice within ten (10) days of its receipt |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | thereof, the undisputed portion of such legal invoice shall be paid without further order of the Court whereas the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection or entry of an order by this Court, and (c) in the event neither the Debtors, U.S. Trustee nor the Committee shall file with this Court an objection to any such legal invoice within ten (10) days of its receipt thereof, such legal invoice shall be paid without further order of the Court and shall not be subject to any further review, challenge or disgorgement.

The Debtors shall promptly provide the DIP Lender with all required financial reporting and other periodic reporting that is required to be provided to the DIP Lender under the DIP Loan Documents.

Debtors shall continue to direct all customers and other account debtors to remit any Proceeds to the M&T Accounts during the Chapter 11 Cases. Debtors shall be authorized to disburse from the M&T Accounts to each Floorplan Lender the amount of Proceeds received from the sale of Inventory or Equipment subject to the liens the Floorplan Financing Facility of such Floorplan Lender in accordance with the ordinary course prepetition practices of Borrower and Guarantors under the terms of the Floorplan Financing Facilities and the Floorplan Intercreditor Agreements.

Debtors shall furnish to Administrative Agent and the Floorplan Lenders each week, a Floorplan Lender Payment Report; provided that the Floorplan Lender Payment Report delivered to each of the Floorplan Lenders shall be limited to sale information related to such Floorplan Lender's collateral and include copies of any bills of sale or retail installment sales agreements.

As security for any Diminution in Value, Floorplan Lenders shall be granted Floorplan Lender Adequate Protection Liens, which Floorplan Lender Adequate Protection Lien shall be junior and subordinate only to (A) the Carve-Out, (B) DIP Lender's liens on the Collateral to secure the Obligations, and (C) solely with respect to the Collateral, the Prepetition Lender Adequate Protection Liens, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Floorplan Lender Prepetition Collateral.

As adequate protection for any Diminution in Value, as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of any Diminution in Value (the "Floorplan Lender Superpriority Claim"), Floorplan Lenders shall be granted an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any successor bankruptcy cases senior to any and all other administrative expense claims |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | in such cases, but junior to (A) the Carve-Out, (B) the DIP Loan Superpriority Claim, and (C) the Prepetition Lender Superpriority Claim. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | Interim Order paras. 3.1 and 3.2 | Unless waived by the DIP Lender in writing in accordance with the terms of the DIP Credit Agreement or the DIP Loan Documents, the occurrence of any of the following events shall constitute an "Event of Default" under the Interim Order: (a) any Debtor's failure to perform, in any material (as determined by the DIP Lender in its sole discretion) respect, any of its obligations under the Interim Order; or (b) an "Event of Default" under the DIP Credit Agreement or any of the other DIP Loan Documents. Upon the DIP Lender's service of a notice of occurrence of and during the continuance of an Event of Default, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in the Interim Order, the DIP Credit Agreement and the other DIP Loan Documents, and (b) the DIP Lender shall be entitled to take any act or exercise any right or remedy as provided in the Interim Order or any DIP Loan Document, as applicable, including, without limitation, declaring all Obligations then outstanding immediately due and payable, accelerating the Obligations, ceasing to extend DIP Loans on behalf of any Debtor, setting off any Obligations with Collateral or proceeds in DIP Lender's possession, and enforcing any and all rights with respect to the Collateral. Except as expressly set forth in Section 2.5 of the Interim Order, DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default. It shall be an Event of Default for the Debtors to seek or obtain such an order, which seeks to sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral outside the ordinary course, other than pursuant to the terms of the DIP Loan Documents or Court order, without the prior written consent of DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender). All cash proceeds generated from the sale of the Collateral shall be paid to the DIP Lender in accordance |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | with the DIP Credit Agreement upon the closing of such sale for permanent application to the Obligations owing by Debtors to the Prepetition Lender and the DIP Lender, as applicable in accordance with the terms and conditions of (a) the Interim Order and (b) the DIP Credit Agreement and other DIP Loan Documents until such time as all such Obligations are Paid in Full.<br><br>It shall be an Event of Default for the Debtors to seek or obtain such an order, without the consent of the DIP Lender, to (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise. |
| Waiver / Modification of the Automatic Stay<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Interim Order para. 3.4. | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restrictions imposed by an order of the Court or applicable law are modified to the extent necessary to permit the DIP Lender to perform, immediately upon entry of the Interim Order and at any time thereafter, any act authorized or permitted under or by virtue of the Interim Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations or the Obligations, as applicable, including, without limitation, all interest, fees, costs and expenses permitted under the DIP Loan Documents (subject to Section 5.12 of the Interim Order) and apply such payments to the Prepetition Obligations or Obligations pursuant to the DIP Loan Documents and the Interim Order, as applicable.<br><br>Without limiting the foregoing, upon the occurrence of an Event of Default and the DIP Lender providing five (5) days (the "Default Notice Period") prior written notice (the "Enforcement Notice") to (i) counsel for the Debtors, (ii) counsel for the Committee, and (iii) the U.S. Trustee, the DIP Lender shall be entitled without further notice, application or order of the Court to take any action and exercise all other rights and remedies provided to it by the Interim Order, the DIP Loan Documents or applicable law that DIP Lender may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Lender has been or may hereafter be granted liens or security interests to obtain the |

| DIP Facility Term | Provision of Interim Order | Summary of Material Terms/Significant Provisions Pursuant to Bankruptcy Rule 4001 |
|---|---|---|
| | | indefeasible repayment in full of all Obligations.<br><br>Notwithstanding anything to the contrary, any action that DIP Lender is otherwise permitted to take pursuant to the Interim Order to (i) terminate the commitments under the DIP Loan Documents, accelerate the DIP Loans, (iii) send blocking notices or activation notices pursuant to the terms of any Blocked Account Agreement, and (iv) repay any amounts owing in respect of the Obligations (including, without limitation, fees, indemnities and expense reimbursements), in each case, shall not require any advance notice to the Debtors. During the Default Notice Period, the Debtors, the U.S. Trustee, and the Committee shall be entitled to seek an emergency hearing, and the DIP Lender shall consent to such emergency hearing within the Default Notice Period; *provided* that if a request for such hearing is made prior to the end of the Default Notice Period, then the Notice Period shall be continued until the Court hears and rules with respect thereto. During the Default Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of the Interim Order, solely to pay necessary expenses set forth in the Budget which have been approved by the DIP Lender (except as otherwise specifically provided in Section 2.3 and Section 2.4 of the Interim Order), and the DIP Lender shall have the rights set forth in this paragraph, without the necessity of seeking relief from the automatic stay. |
| **Waiver of Rights Under Section 506(c)** Bankruptcy Rule 4001(c)(1)(x) | Interim Order para. 4.2. | No costs or expenses of administration which have or may be incurred in the Chapter 11 Cases shall be charged against DIP Lender or Prepetition Lender, or their respective claims or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of such Lender, and no such consent shall be implied from any other action, inaction or acquiescence by DIP Lender or Prepetition Lender.<br><br>Any 506(c) surcharge shall be waived with respect to all Floorplan Lenders participating in the DIP Facility or Carve Out. For the avoidance of doubt, Debtors shall be allowed to surcharge via section 506(c) of the Bankruptcy Code all Floorplan Lenders not participating in the DIP Loan and Carve Out. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | | |

## BENEFITS OF PROPOSED FACILITY; FAIR AND REASONABLE TERMS

**A.** **_Benefits of the Proposed DIP Facility_**

24.      In addition to providing a liquidity infusion necessary to fund critical expenditures and implement a value-maximizing going concern sale, the proposed DIP Facility contains several favorable terms and conditions to the Debtors.

25.      The proposed DIP Facility satisfies the Debtors' primary strategic considerations and will satisfy the Debtors' post-petition liquidity needs, will provide the Debtors with sufficient flexibility to operate their businesses in an efficient manner in the ordinary course of business, and is in the best interests of the Debtors and their estates.

**B.** **_The DIP Facility Terms Are Reasonable under the Circumstances_**

26.      The obligations, interest rate, fees, maturity, covenants, and milestones under the DIP Facility are reasonable, taken as a whole, under the circumstances and are generally consistent with market terms for companies facing similar circumstances as the Debtors and provides the best financing option currently available to the Debtors under the circumstances. Accordingly, the DIP Lender has acted in good faith and has agreed to provide the DIP Facility to the Debtors on terms that are fair and reasonable under the current circumstances and market conditions.

DIP Liens

27.      As security for any Diminution in Value, the Prepetition Lender shall be granted the Prepetition Lender Adequate Protection Liens, which shall be junior and subordinate only to (A) the Carve-Out, (B) the Prepetition Permitted Senior Liens, and (C) DIP Lender's liens on the Collateral to secure the Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

28.      As adequate protection for any Diminution in Value, the Prepetition Lender shall be granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to

the extent of any Diminution in Value, the Prepetition Lender Superpriority Claim. The Prepetition Lender Superpriority Claim shall be junior only to (A) the Carve-Out and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims, including administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

29.     As security for any Diminution in Value, each Floorplan Lender shall be granted a Floorplan Lender Adequate Protection Lien, which shall be junior and subordinate only to (A) the Carve-Out, (B) DIP Lender's liens on the Collateral to secure the Obligations, and (C) solely with respect to the Collateral, the Prepetition Lender Adequate Protection Liens, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Floorplan Lender Prepetition Collateral.

30.     As adequate protection for any Diminution in Value, each Floorplan Lender shall be granted as and to the extent provided by section 507(b) of the Bankruptcy Code, and solely to the extent of any Diminution in Value, a Floorplan Lender Superpriority Claim in each of the Chapter 11 Cases and any successor bankruptcy cases senior to any and all other administrative expense claims in such cases, but junior to (A) the Carve-Out, (B) the DIP Loan Superpriority Claim, and (C) the Prepetition Lender Superpriority Claim.

31.     Absent the foregoing protections, the DIP Lender and Floorplan Lenders would not have agreed to provide the DIP Facility and Carve Out to the Debtors.

## C.     *The Proposed DIP Facility Fees Are Fair and Reasonable*

32.     The DIP Lender has committed to provide a substantial amount of capital to ensure successful execution of the DIP Facility. In view of those commitments and the circumstances of the Chapter 11 Cases, including the magnitude of the Debtors' Chapter 11 Cases and the tangible

benefit to the estate of a substantial committed post-petition financing, the consideration being provided to the DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable in amount, appropriately compensates the DIP Lender for its costs and the assurances it is providing to the process, and is necessary to obtain the DIP Facility, which will permit the Debtors to both (i) continue operating their businesses and (ii) maximize the value of their estates.

<u>DIP Fees</u>

33.     In consideration for the DIP Lender's commitments in connection with the DIP Facility, the Debtors have agreed to, among other things, (i) pay certain fees (the "<u>DIP Fees</u>"), as discussed in the table above, (ii) pay reasonable and documented out-of-pocket fees and expenses for the DIP Lender (including reasonable and documented fees and expenses of outside counsel) (the "<u>Out-of-Pocket Expenses</u>" and, together with the DIP Fees, the "<u>DIP Fees and Expenses</u>"), and (iii) indemnify the DIP Lender in accordance with the DIP Loan Agreement.

<u>Reasonableness of DIP Fees</u>

34.     The DIP Fees and Expenses were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lender, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lender as consideration for the extension of post-petition financing. It is unlikely that a financing commitment with terms similar to those in the DIP Facility was available to the Debtors for lower fees given the existing liens against the Debtors' assets, and the Debtors' liquidity position.

**BASIS FOR RELIEF**

35.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. The Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in

accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)-(b); 503(b)(1). Having determined that post-petition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lender to secure the DIP Facility on the terms described herein. For these reasons, the Debtors submit that they satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the DIP Facility.

**A.** ***Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment***

36.     The relief requested by the Motion is warranted for several reasons:

- ▪ Immediate access to the DIP Facility is critical to ensure sufficient working capital to operate the Debtors' businesses, to maintain and preserve the the Debtors' assets for the Marketing Process, and to administer the Debtors' estates.

- ▪ The DIP Facility is necessary for the Debtors to avoid immediate and irreparable harm to their estates.

- ▪ Negotiations with the DIP Lender were conducted in good faith and at arms' length. The DIP Facility, taken as a whole, is reasonable under the facts and circumstances and represents the Debtors' best currently available option.

For those reasons and the reasons set forth below, the Debtors respectfully request that the Court grant the relief requested herein.

37.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

38.     Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06- 11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

39.      Further, in considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855—86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

40.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives. Given the nature of the Debtors' relatively limited unencumbered asset pool, the DIP Lender is the best available financing source that could commit to a facility on the most favorable terms, and enable the Debtors to avoid a potentially costly and protracted priming fight. The Debtors negotiated the DIP Loan Documents

with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these Chapter 11 Cases, and on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

41. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

42. To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40. However, section 364 "imposes no duty to seek credit from every possible lender

before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

43.     Given the Debtors' cashflow constraints, a post-petition unsecured facility is not available. The Court should, therefore, authorize the Debtors to provide the DIP Lender with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, further secured by perfected senior priority security interests in and liens on the Collateral pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (subject and subordinate only to the Carve-Out and the Permitted Liens)..

44.     The DIP Facility is necessary to preserve the Debtors' estates. The Debtors require access to the DIP Facility and access to Cash Collateral to ensure they have sufficient liquidity to operate their business, enter into post-petition agreements, and administer their estates in the ordinary course for the duration of these Chapter 11 Cases. The Debtors' operating cash flow, as currently projected, will not be sufficient to fund ongoing operations and expenses for the projected duration of these Chapter 11 Cases, including administrative costs associated with these Chapter 11 Cases.

45.     The terms of the DIP Facility are fair and reasonable under the circumstances. The DIP Facility represents the most favorable source of post-petition financing and is designed to provide the Debtors with sufficient liquidity for the duration of these Chapter 11 Cases.

**B.      *The Debtors Should Be Authorized to Use Cash Collateral of the DIP Lender and Floorplan Lenders***

46.     The Debtors may require use of Cash Collateral of the DIP Lender and Floorplan Lenders for working capital and to fund their Chapter 11 Cases, which the DIP Lender and Floorplan Lenders have agreed to, subject to the Budget. Section 363(c) of the Bankruptcy Code

governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

47.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.

## C.     The Debtors Should Be Authorized to Pay Fees Required by the DIP Loan Documents

48.     As described herein, the Debtors have agreed, subject to Court approval, to pay the DIP Fees in exchange for the DIP Lender providing the DIP Facility, and, taken as a whole, the terms of the DIP Loan Documents, including the fees imposed thereunder, are reasonable under the facts and circumstances and are the Debtors' best—and in fact only—currently available option to maintain its ongoing business operations and to fund these Chapter 11 Cases.

49.     The Debtors considered the DIP Fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying these fees in order to obtain the DIP Facility is in the best interest of the Debtors' estates. Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### D. *The Carve Out is Appropriate*

50. The DIP Loan Documents subject the DIP Lender's and the Floorplan Lenders' security interests, super-priority administrative expense claims, and the adequate protection claims and liens to the Carve Outs. Without the Carve Outs, the Debtors' estate and stakeholders could be harmed because the services professionals might otherwise provide in these Chapter 11 Cases could be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve Outs protect against administrative insolvency during the pendency of these Chapter 11 Cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and the Committee. Accordingly, the Debtors submit that the Carve Outs are appropriate.

### E. *The DIP Lender and Floorplan Lenders Should Be Deemed a Good Faith Lender Under Section 364(e)*

51. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

52. Here, the Debtors believe the DIP Loan Documents embody the most favorable terms on which the Debtors could obtain post-petition financing. The negotiations of the terms of

the DIP Facility and the Carve Outs with the DIP Lender and Floorplan Lenders were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Loan Documents are reasonable, and the proceeds of the DIP Facility and the Carve Outs will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Interim and Final Orders and the DIP Loan Documents and in accordance with the Budget (subject to any permitted variance). Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender and the Floorplan Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender and Floorplan Lenders thus are entitled to all of the protections afforded by that section.

**F.      There Is Cause for Modification of the Automatic Stay**

53.      The relief requested herein contemplates a modification of the automatic stay (if applicable) to the extent necessary to permit the DIP Lender and Floorplan Lenders to perform, immediately upon entry of the Interim Order and at any time thereafter, any act authorized or permitted under or by virtue of the Interim Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations or the Obligations, as applicable, including, without limitation, all interest, fees, costs and expenses permitted under the DIP Loan Documents (subject to Section 5.12 of the Interim Order) and apply such payments to the Prepetition Obligations or Obligations pursuant to the DIP Loan Documents and the Interim Order, as applicable.  These provisions were part of the quid pro quo for the Debtors' ability to obtain the DIP Facility and the Carve Outs and

use Cash Collateral as provided therein and in the Interim Order. Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

54.     Stay modifications of this kind are ordinary and standard features of post-petition financing facilities and, in the Debtors' business judgment, are appropriate under the present circumstances. *See, e.g., In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

**G.      The Debtors Have an Immediate Need for Access to Cash Collateral and DIP Financing**

55.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, Courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

56.     Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Thus, the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance its operations and continue operating as a going concern during the pendency of these Chapter 11 Cases. In addition, access to the DIP Facility will provide the Debtors with

financial stability in the event of unforeseen circumstances. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## H.   *Basis for Waiver of Section 552(b)*

57.   To the extent applicable, the DIP Lender requires the Debtors to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code, subject to and effective upon entry of the Final Order. The Debtors are seeking approval of the "equities of the case" waiver only upon entry of the Final Order, thereby allowing parties in interest an opportunity to be heard in connection therewith. Therefore, the Debtors submit that the proposed "equities of the case" waiver is appropriate.

## REQUEST FOR FINAL HEARING

58.   Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## EMERGENCY CONSIDERATION

59.   The Debtors respectfully request emergency consideration of this Motion.  The Debtors believe that the DIP Facility is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## REQUEST FOR WAIVER OF STAY

60.     To implement the foregoing, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## NOTICE

61.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Northern District of Texas; (b) the holders of the 30 largest unsecured claims (on a consolidated basis); (c) counsel to M&T (akramer@otterbourg.com; klippman@munsch.com); (d) counsel to the Committee (mlitvak@pszjlaw.com); and (e) counsel for the CASE Lender, Joseph Coleman (jcoleman@krcl.com); (f) counsel to CASE, Foley & Lardner LLP, Michael J. Lockerby (mlockerby@foley.com); (g) the Floorplan Lenders; and (h) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

62.     In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: December 11, 2025            Respectfully submitted,

                                        */s/ Joshua N. Eppich*
                                        **BONDS ELLIS EPPICH SCHAFER JONES LLP**
Joshua N. Eppich    (Texas Bar No. 24050567)
Eric T. Haitz    (Texas Bar No. 24101851)
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: eric.haitz@bondsellis.com

-and-

Ken Green    (Texas Bar No. 24036677)
402 Heights Boulevard
Houston, Texas 77007
(713) 335-4990 telephone
(713) 335-4991 facsimile
Email: ken.green@bondsellis.com

COUNSEL FOR THE DEBTORS

## CERTIFICATE OF SERVICE

I certify that on December 11, 2025, a true and correct copy of the foregoing document was served via the Court's CM/ECF system.

                                          */s/ Eric T. Haitz*
                                        Eric T. Haitz